Entered: October 26th, 2021
Signed: October 26th, 2021



THOMAS J. CATLIOTA
U.S. BANKRUPTCY JUDGE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
## at GREENBELT

| | | |
|---|---|---|
| In re: | * | Case No.   21-14213-TJC |
| Family Friendly Contracting LLC | * | Chapter    11, Subchapter V |
| Debtor | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| Stephen P. Lyons | * | |
| Movant | * | |
| vs. | * | ECF Nos. 90 and 96 |
| Family Friendly Contracting LLC | * | |
| Respondent | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

### MEMORANDUM OF DECISION

Debtor Family Friendly Contracting LLC filed for relief under Chapter 11 of the
Bankruptcy Code, and elected to proceed as a debtor under Subchapter V.  Stephen P. Lyons
objects to the Debtor's eligibility to make the election.  He alleges that a large portion of the
Debtor's debts arose from a loan transaction that was made for the benefit of the Debtor's
owners, not the Debtor.  He therefore contends the majority of the Debtor's debts do not arise
from the "commercial or business activities" of the Debtor as required by §1182(1)(A) of the
Bankruptcy Code.  The Debtor opposes Mr. Lyons's objection.  For the following reasons, the

1

Court concludes the Debtor's debts "arose from commercial or business activities of the debtor" as required by §1182(1)(A), making it eligible to be a debtor under Subchapter V.  The objection is overruled.

### Jurisdiction

The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. §1334, 28 U.S.C. §157(a), and Local Rule 402 of the United States District Court for the District of Maryland.  This matter is a "core proceeding" under 28 U.S.C. §157(b)(2) and the Court has authority to enter a final judgment.

### Findings of Fact

The Debtor is a Maryland limited liability company that filed for bankruptcy relief on June 27, 2021.  On the petition, it stated it was a debtor under 11 U.S.C. §1182(1) and elected to proceed under Subchapter V of Chapter 11.  ECF 1 at p. 2 of 62.

The Debtor provides home improvement, restoration and contract management services to homeowners and commercial properties in Maryland, D.C., and West Virginia.  The Debtor also does remodeling, additions, basement finishing, and service support for property management companies.  It has operated from its headquarters at 9001 Baltimore Road, Frederick, Maryland (the "Property") since around 2017.

The Debtor filed its original schedules on July 16, 2021, and its amended schedules on July, 28, 2021, at ECF 40 and 72, respectively.  According to the original Schedules D, E and F, the Debtor has $6,350,207.59 of total debts.  *See* ECF 40 at p. 1.  In the amended schedules, the Debtor increased the amount of the unsecured debt by a small amount, but the difference is not meaningful here.  *Compare* ECF 40 at p. 72 *with* ECF 72 at p. 58.

Included in the scheduled debts are three loans the Debtor owes to Live Oak Banking Company ("Live Oak") listed in the amounts of $4,912,053.87, $491,340.56, and $250,000

(collectively, the "Live Oak Loans").  ECF 40 at pp. 12-13.  The Live Oak Loans are not listed as contingent or unliquidated.

The Live Oak Loans are the focus of Mr. Lyons's objection, and were made in connection with his sale of the Debtor and the Property.  Prior to November 20, 2020, Mr. Lyons was the 100% owner of both the Debtor and Lyons Landholdings, LLC, an affiliated entity that owned the Property.  Mr. Coleman V. Ruiz and Mr. Adam Borcz agreed to purchase the Debtor and the Property.  They did so through a holding company, FFC Holdings, LLC ("Holdings").  Specifically, the parties entered the "Membership Interest Purchase Agreement of Family Friendly Contracting, LLC and Lyons Landholdings, LLC by and between Stephen Lyons and FFC Holdings, LLC" (the "MIPA").  ECF 139-5.  Under a separate Agreement of Sale and Purchase, Lyons Landholdings, LLC agreed to sell the Property to Holdings for $1,200,000.  ECF 139-6.  The sale of the member interests and the sale of the Property were mutually contingent on each transaction closing.

Under the MIPA, Mr. Lyons sold to Holdings the member interests in the Debtor for $4,650,000.  ECF 139-5 at p. 12.  The MIPA required that an escrow would be established in the amount of the Debtor's loans under the Small Business Administration Payroll Protection Program to be held by the lender that made the PPP loan.  *Id*. at pp. 12-13.  It required that all indebtedness of the Debtor, other than current liabilities, must be paid at closing.  *Id*. at p. 13.  The MIPA required that, at closing, the Debtor must have a target working capital of $600,000, determined by netting out the Debtor's accounts payable form the value of its receivables.  *Id*. at p. 14.  It also required that an escrow be established of $465,000 to ensure, among other things, that various obligations of the Debtor were satisfied.

To fund the transaction, the Debtor and Holdings executed the Live Oak Loans in the total amount of $5.75 million, comprised of three notes in the amounts of $5,000,000, $500,000 and $250,000. The U.S. Small Busines Administration guaranteed the $5,000,000 note. The $250,000 loan was designated for working capital for the Debtor. Both the Debtor and Holdings are the "Borrower" under the Live Oak Loans, and both are jointly and severally obligated. Both the Debtor and Holdings pledged all of their assets to secure the Live Oak Loans.

Mr. Ruiz is the Debtor's Chief Executive Officer and manages all aspects of the Debtor's business operations. Mr. Borcz is the Debtor's Chief Financial Officer. ECF 30. Holdings serves solely as the holding company for the Debtor's member interests and the Property. ECF 96 at p. 4 of 9.

### Conclusions of Law

The Small Business Reorganization Act ("SBRA") became effective on February 19, 2020, and created Subchapter V as a new subchapter of chapter 11. Pub. L. No. 116-54 § 5, 133 Stat. 1079, 1087. It "offers small business debtors, including individuals, a streamlined process and tailored tools for confirming a plan." *In re Trepetin*, 617 B.R. 841, 842 (Bankr. D. Md. 2020). The legislative history of the SBRA demonstrates "that the primary purpose of the SBRA is to promote successful reorganizations using the tools that are now available under current law." *In re Progressive Solutions, Inc*., 615 B.R. 894, 900 (Bankr. C.D. Cal. 2020).

Only a "debtor" as defined in §1182(1)(A) may elect to proceed under Subchapter V. It provides:

(1) The term "debtor"—

(A) subject to subparagraph (B), means a person engaged in commercial or business activities (including any affiliate of such person that is also a debtor under this title and excluding a person whose primary activity is the business of owning single asset real estate) that has aggregate noncontingent liquidated secured and unsecured

debts as of the date of the filing of the petition or the date of the order for relief in an amount not more than $7,500,000 (excluding debts owed to 1 or more affiliates or insiders) not less than 50 percent of which arose from the commercial or business activities of the debtor.

11 U.S.C. §1182(1)(A).

The parties do not dispute that the Debtor was a "person" that was "engaged in commercial or business activities" as of the petition date, or that the Debtor met the debt limitation requirements of §1182(1)(A). The dispute is whether less than fifty percent of the Debtor's aggregate noncontingent liquidated secured and unsecured debts as of the petition date "arose from the commercial or business activities of the debtor." The tipping point is the debt represented by the Live Oak Loans. If that debt did not arise from the commercial or business activities of the Debtor, the Debtor is not eligible for Subchapter V. The Debtor carries the burden of establishing Subchapter V eligibility. *In re Blue*, 630 B.R. 179, 187 (Bankr. M.D.N.C. 2021).

"The task of resolving the dispute over the meaning of . . . [a statute] begins where all such inquiries must begin: with the language of the statute itself." *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241 (1989); *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 69 (2011). "[W]here, as here, the statute's language is plain, the sole function of the courts is to enforce it according to its terms." *Ron Pair Enterprises, Inc.* 489 U.S. at 241. "It is a fundamental canon of statutory construction that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014); *Perrin v. United States*, 444 U.S. 37, 42 (1979).

Since the enactment of the SBRA, many courts have considered the meaning of the phrase "commercial or business activities" of the debtor. Virtually all have applied a liberal construction of the phrase in keeping with the SBRA's purpose and the language of §1182(1)(A).

*In re Offer Space, LLC*, 629 B.R. 299, 306 (Bankr. D. Utah 2021); *In re Blue*, 630 B.R. at 191; *In re Ellingsworth Residential Cmty. Ass'n, Inc.*, 619 B.R. 519, 521 (Bankr. M.D. Fla. 2020) ("Congress could have chosen different terms or added other exclusions when drafting the SBRA but instead chose very broad language.").

"[T]he phrase 'commercial or business activities' is exceptionally broad." *In re Ikalowych*, 629 B.R. 261, 276 (Bankr. D. Colo. 2021).

> The term "commercial" is commonly understood to involve commerce. It includes "occupied with or engaged in commerce or work intended for commerce," "of or relating to commerce," and "viewed with regard to profit." Commercial, Merriam-Webster.com Dictionary (www.merriam-webster.com/dictionary/commercial) (last updated July 8, 2021). Commerce is defined as "the exchange or buying and selling of commodities on a large scale involving transportation from place to place." Commerce, Merriam-Webster.com Dictionary (www.merriam-webster.com/dictionary/commerce) (last updated July 8, 2021).

> The term "business" has a similar meaning. Business is defined as "a usually commercial or mercantile activity engaged in as a means of livelihood," or "dealings or transactions especially of an economic nature." Business, Merriam-Webster.com Dictionary (www.merriam-webster.com/dictionary/business) (last updated July 11, 2021).

*In re Vertical Mac Constr., LLC,* No. 6:21-BK-01520-LVV, 2021 WL 3668037, at *3 (Bankr. M.D. Fla. July 23, 2021).  For example, Black's Law Dictionary notes that "business activities" can be either "the carrying out of a series of similar acts for the purpose of realizing a pecuniary benefit, or otherwise accomplishing a goal." *In re Ellingsworth Residential Cmty. Ass'n, Inc.*, No. 6:20-CV-1243-WWB, 2021 WL 3908525, at *3 (M.D. Fla. Aug. 19, 2021) (quoting Doing Business, Black's Law Dictionary (11th ed. 2019)).  The plain and ordinary meaning of "commercial or business activities" does not require a profit motivation.  *Id.*  In a different context, the Fourth Circuit has held that test for determining if a debt is a commercial, rather than a consumer, debt is whether it was "incurred with a profit motive or in connection with a business transaction." *Kestell v. Kestell (In re Kestell)*, 99 F.3d 146, 149 (4th Cir. 1996).

Similarly, the term "activities" is very broad.  It encompasses "any act of a business or commercial nature" and is broader than the narrower term "operations."  *In re Vertical Mac Constr., LLC,* 2021 WL 3668037 at *3.

Here, the Debtor entered into an integrated business transaction with Live Oak and Holdings, executed the three notes under which it was obligated to repay $5.75 million, pledged all of its assets, and received proceeds and other benefits.  It simply cannot be disputed that, under the ordinary, contemporary, common meaning of the phrase, the debt "arose from the commercial or business activities . . . of the debtor."  §1182(1)(A).

Mr. Lyons does not dispute that the Live Oak Loans were "commercial or business activities" and were made by the Debtor.[1]  He argues that, although the loans were made *by* the Debtor, they are not activities *of* the Debtor.  In support, he argues the loans allowed Mr. Ruiz and Mr. Borcz to acquire the Debtor's member interests and the Property through Holdings.  He argues, therefore, that most of the Live Oak Loan debt did not arise from activities "of the debtor" because it primarily benefitted the owners and an affiliate of the Debtor, not the Debtor itself.  ECF 90 at ¶20.

Mr. Lyons relies on *In re Ventura,* 615 B.R. 1 (Bankr. E.D.N.Y. 2020).  There the court considered whether the mortgage loan on the debtor's primary residence was consumer debt, and therefore the debtor would not be eligible under §1182(1)(A), or arose from the commercial or business activities of the debtor, making the debtor eligible.  The debtor acquired the residential property with the intention of converting it into a guest house and to later use it as a bed and

---

[1] Mr. Lyons states that Holdings and the Debtor have asserted, or plan to assert, claims against him arising out of the purchase of the Debtor's interests.  ECF 30 at n. 3.  The Debtor questions his standing to raise the objection because he did not hold a claim against the Debtor on the petition date.  At the hearing held on October 18, 2021, he testified he acquired a $500 claim during the case.  His $500 claim appears to give him, at least facially, a pecuniary interest in the case, *see Willemain v. Kivitz*, 764 F.2d 1019, 1020 (4th Cir. 1985); although the Court has misgivings about his role.  Whether he can continue to participate in the case will be addressed as appropriate or necessary.

7

breakfast.  The court noted the definition of "consumer debt" in §101(8) of the Bankruptcy Code is debt "incurred by an individual *primarily* for a personal, family, or household purpose."  *In re Ventura*, 615 B.R. at 18 (emphasis added).  It held that, in making the determination, it should look to the substance, rather than the form, of the transaction, and determine the primary purpose of the transaction.  After doing so, the court concluded that the mortgage on the debtor's primary residence was commercial debt because of the debtor's reason for purchasing the property.

Mr. Lyons contends *Ventura* requires this Court to make a "primary purpose" assessment of the transaction and determine that debt is "of the debtor" only if the primary purpose of the Live Oak Loans was to benefit the Debtor.  The Court disagrees.  The primary purpose test is applied to resolve the binary question of whether a debt is commercial or consumer.  A transaction can have both commercial and consumer attributes, and a court must determine whether it is one or the other by assessing why the debt was "primarily" incurred.  §101(8).  The language of §1182(1)(A) does not require, or even invite, this inquiry where the debt so clearly arose from the commercial or business activities of the debtor.

Focusing solely on the primary purpose of a business transaction to determine whether the debt is "of the debtor" ignores the reality that a business transaction can benefit more than one party, and generally does when the debt that arose from the transaction is mutual among more than one party.  Stated otherwise, a debt can arise from the commercial or business activities of a debtor while, at the same time, also arising from the commercial or business activities of the joint obligor.  Primacy is not included in the assessment once the debt is determined to be incurred through the debtor's commercial or business activities.

Here, the Live Oak Loans were noncontingent debts of the Debtor when they were incurred.  Looking at the substance of the transaction, the Debtor and Holdings incurred the Live

Oak Loans as part of a fully integrated transaction that allowed Mr. Ruiz and Mr. Borcz to acquire the Debtor and the Property on which it operated, but which also provided substantial direct and indirect financial and other benefits to the Debtor designed to strengthen its prospects post-sale.  As examples, the Debtor obtained a $250,000 working capital loan from Live Oak; the MIPA required that all indebtedness of the Debtor was paid at closing; it also required that an escrow be established equal to the full value of the debtor's Paycheck Protection Program loans; and it required that the Debtor obtain a target working capital reserve of $600,000.  Further, the loans allowed the Debtor's affiliate to acquire the Property, which insured the Debtor would be able to continue to operate at the Property, as it did prior to Mr. Lyons's sale of the Debtor and has done since the transaction.  And it cannot be said that the change in management and ownership of the Debtor was not intended to benefit the Debtor.  Mr. Ruiz and Mr. Borcz not only acquired the member interests of the Debtor in the transaction, they became the Debtor's Chief Executive Officer and the Chief Financial Officer, respectively.  They quite obviously believed their ownership and management of the Debtor would enhance its operations and profitability.  The Debtor, and its future course of conduct, was at the very center of the entire transaction.

The statute does not require the court to dissect the various benefits obtained by all the parties and, for purposes of §1182(1)(A), include only debt that is linked to a direct benefit obtained by a debtor, while excluding debt that directly benefitted others.  Mr. Lyons's request that the Court consider the primary purpose of the Live Oak Loans is not consistent with the statutory language and ignores the substance of the transaction, including an assessment of the direct and indirect benefits the Debtor obtained.

**Conclusion**

9

For the foregoing reason, the Debtor is a "debtor" under §1182(1)(A) and is eligible for

Subchapter V.

cc:
      Debtor
      Counsel for the Debtor
      Movant – Stephen P. Lyons
      Counsel for the Movant
      Subchapter V Trustee
      United States Trustee

**End of Memorandum of Decision**